**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:09-CR-200 |
| | ) | |
| JANIS WILEY, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

This matter is before the Court on the Motion to Suppress Evidence and Statements and Request for an Evidentiary Hearing, filed by Defendant, Janis Wiley, on September 3, 2010. For the reasons set forth below, Defendant's motion to suppress evidence and statements is **DENIED**.

BACKGROUND

Defendant, Janis Wiley, has filed the instant motion seeking to suppress statements she made and evidence located after a search of her purse on February 24, 2009. This Court held an evidentiary hearing on September 17, 2010. At the conclusion of the hearing, the Court took Defendant's motion under advisement and gave the parties an opportunity to file post-hearing briefs. These briefs have now been filed.

Defendant presents two arguments in support of her motion.

First, Defendant argues that the February 24, 2009, statements she made to law enforcement officers should be suppressed because they were made during a custodial interrogation where she was never provided *Miranda*[1] warnings.  And, second, Defendant asserts her consent to the search of her purse and to police questioning was involuntary due to her Vicodin use and addiction.

In response, the Government argues that no *Miranda* warnings were necessary because Ms. Wiley was not, and could not reasonably believe, she was in custody at any time during February 24, 2009. In addition, the Government asserts that, based upon the totality of the circumstances, Ms. Wiley's consent was voluntary.

In making the following findings of fact, the Court considered all of the evidence submitted, including the credibility of the witnesses.

FINDINGS OF FACT

On February 24, 2009, Lindsay Kozinski drove to Dr. Adolph Yaniz's office with Janice Wiley.  (Tr. 14).  Both Ms. Kozinski and Ms. Wiley worked for Dr. Yaniz.  (Tr. 15).  Ms. Kozinski's duties consisted of answering telephones, pulling patient charts, and escorting patients to examination rooms.  (Tr. 13).  Ms. Wiley's duties primarily consisted of checking in patients and collecting money from patients. (Tr. 15).  Ms. Kozinski and Ms. Wiley arrived

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1965).

at work at approximately 9 a.m. (Tr. 19). Shortly after arriving at work, Ms. Kozinski witnessed Ms. Wiley taking a couple of pills; however, Ms. Kozinski does not know what those pills were. (Tr. 48, 49). In any event, Ms. Kozinski did not believe Ms. Wiley was impaired in any way that day. (Tr. 41, 49, 50).

On that day, UPS delivered a shipment of Vicodin pills to Dr. Yaniz's office. (Tr. 23). Before leaving work, Ms. Kozinski placed a bag containing 8500 of those Vicodin pills into the trunk of her vehicle. (Tr. 21). In addition, Ms. Wiley took one bottle of those Vicodin pills and placed it in her purse. (Tr. 23). Ms. Kozinski and Ms. Wiley left work together in Ms. Kozinski's vehicle at around noon or 1 p.m. (Tr. 19, 20).

Unbeknownst to either Ms. Kozinski or Ms. Wiley, the DEA was investigating Dr. Yaniz for the illegal distribution of controlled drugs. (Tr. 81). DEA Special Agent Michael Burke participated in this investigation on February 24, 2009. (Tr. 79). Agent Burke had learned that Dr. Yaniz was under investigation for improperly dispensing controlled substances. (Tr. 81). One method Dr. Yaniz used to facilitate this scheme was to have members of his office collect the drugs once they were delivered by UPS and take them to a predetermined location. (Tr. 81).

Agent Burke conducted surveillance of Dr. Yaniz's office on February 24, 2009. (Tr. 81). After UPS made a delivery to Dr. Yaniz's office, Agent Burke observed two women exit the office and

place a container in the back of a Nissan. (Tr. 83). The women then left the area and their vehicle was followed. (Tr. 83). These two women were identified as Linda Kozinski and Janice Wiley. (Tr. 83).

After leaving Dr. Yaniz's office, Ms. Kozinski's vehicle was pulled over by the a Merrillville police officer for failing to use a turn signal. (Tr. 35). Ms. Kozinski then pulled into a gas station. (Tr. 42). The Merrillville police officer approached Ms. Kozinski's vehicle and asked for Ms. Kozinski's driver's license, and insurance. (Tr. 42). Ms. Kozinski mistakenly gave the officer a state identification card instead of her driver's license. (Tr. 42). The officer went back to his vehicle but then returned to Ms. Kozinski's vehicle to retrieve her driver's license. (Tr. 42). Ms. Kozinski handed the officer her driver's license, and the officer returned to his vehicle. (Tr. 42). Ms. Kozinski's vehicle was not blocked in or surrounded during this stop. (Tr. 50, 51).

Agent Burke and a FDA agent then approached the vehicle; Agent Burke asked Ms. Kozinski and Ms. Wiley to put their hands up into the air. (Tr. 42). When the Merrillville police officer first approached Ms. Kozinski, and agents approached after, Ms. Kozinski felt scared. (Tr. 57). Because law enforcement wanted to speak with Ms. Kozinski she did not think that she had the option to walk away. (Tr. 57). Agent Burke talked to Ms. Kozinski and asked to search her vehicle. (Tr. 90, 91). Ms. Kozinski consented to the

search of her vehicle. (Tr. 42, 91). Ms. Kozinski was then asked to get out of the vehicle. (Tr. 42). Ms. Kozinski got out of the vehicle and talked with the agents. (Tr. 42). The agents told Ms. Kozinski that they had observed her put a bag in the vehicle prior to leaving Dr. Yaniz's office. (Tr. 42). The search produced a number of bottles containing Vicodin pills that were inside the bag Ms. Kozinski placed in the vehicle. (Tr. 93).

At this time, Ms. Kozinski remembers there being at least five officers present, while Agent Burke recalls approximately four officers and/or agents present. (Tr. 43, 92). During this time, Ms. Kozinski noticed that some of the officers were carrying guns in holsters, but no guns were ever taken out of the holsters. (Tr. 51, 52). The agents told Ms. Kozinski that they wanted to talk with her at the Merrillville police station. (Tr. 53). Ms. Kozinski was never told that she was under arrest. (Tr. 45).

While the car was being searched, Ms. Wiley remained in the front passenger seat. (Tr. 95). Agent Burke approached Ms. Wiley, identified himself, and informed her that they were conducting a drug investigation. (Tr. 95). Ms. Wiley reacted like a person would react in that situation; she didn't seem terribly nervous, she seemed composed. (Tr. 92). At some point, Agent Burke asked Ms. Wiley if he could look inside her purse. (Tr. 95). Ms. Wiley consented to the search of the purse. (Tr. 95). Agent Burke looked inside the purse and found pills strewn about as if someone

had dumped a pill bottle in the purse. (Tr. 109). Ms. Wiley informed Agent Burke that she had taken these pills from Dr. Yaniz's office with permission. (Tr. 109). Ms. Wiley was then asked to step out of the vehicle so that the officers could finish searching the vehicle. (Tr. 97). Ultimately, the vehicle was impounded; however, the fact that the vehicle was going to be impounded may have never been relayed to Ms. Wiley. (Tr. 97).

After the search, Ms. Kozinski accompanied the Merrillville police officer to the police station. (Tr. 46). The officer was driving a Mustang. (Tr. 54). Ms. Kozinski sat uncuffed in the front passenger seat. (Tr. 53, 55). She was not told that she was not free to go. (Tr. 54). She was not told that she was under arrest. (Tr. 54).

Agent Burke asked Ms. Wiley if she would accompany him back to the Merrillville police station. (Tr. 97). She agreed. (Tr. 97). Agent Burke drove to the Merrillville police station and Ms. Wiley sat uncuffed in the front passenger seat. (Tr. 122). Agent Burke, who has several years of law enforcement experience in dealing with drug impaired individuals, stated that, based on his training, experience and observations, Ms. Wiley did not appear to be impaired during this time. (Tr. 120, 121).

When Ms. Kozinski arrived at the police station, she went into a room with the officer. (Tr. 55). She was not fingerprinted nor placed in a jail cell. (Tr. 55). The door to the room was

initially open, but the door was closed when the agents came in the room to speak with her. (Tr. 55). Before the agents spoke with her, they read the *Miranda* rights to her. (Tr. 58). At some point, Ms. Kozinski decided she was done talking to them and wanted to leave. (Tr. 56). The conversation ended and Ms. Kozinski was allowed to leave the station. (Tr. 56).

Once Ms. Wiley arrived at the police station, Ms. Wiley and Agent Burke went into, what Agent Burke described as, a mini cafeteria. (Tr. 100). The room contained a long table, a refrigerator, a sink, a lot of chairs and some cabinets. (Tr. 100). The dimensions of the room were approximately twenty feet by twelve feet (20 x 12). Agent Burke got Ms. Wiley a cup of water and he explained to her that she wasn't under arrest and was free to go. (Tr. 123, 124). Agent Burke left Ms. Wiley in the room alone while he went out into the hall to confer with other agents. (Tr. 100). Agents Burke and Bradley Bookwalter then came into the room, told her that she was free to leave, and questioned Ms. Wiley in the cafeteria room. (Tr. 100, 103). No one else was in the room. (Tr. 100, 101). When the interview began, the one door to the room was closed. (Tr. 114). During the interview, Ms. Wiley informed agents that the pills were for her personal use. (Tr. 108).

After the interview with Agents Burke and Bookwalter concluded, Ms. Wiley asked Agent Burke if she could speak privately

with him. (Tr. 102, 103). To accommodate this, Agent Burke took Ms. Wiley into a traditional interview room. (Tr. 102). Ms. Wiley left the police station after talking with Agent Burke. Agent Burke never gave Ms. Wiley any Miranda warnings because he did not see a need to give them to Ms. Wiley. (Tr. 125, 126).

Dr. Sanjeev Joshi testified at the suppression hearing. Dr. Joshi specializes in internal medicine and also has a specialty license to prescribe Suboxone, a drug used to treat narcotic addiction. (Tr. 63, 64). Ms. Wiley saw Dr. Joshi twice in 2009; once in March and again in April. (Tr. 64). In March 2009, Ms. Wiley visited Dr. Joshi complaining that she felt addicted to narcotics and asked to be prescribed Suboxone. (Tr. 64). In previous years, Wiley had been issued prescriptions for Vicodin. (Tr. 26-31). Wiley now takes Vicodin on a regular basis. (Tr. 33). In April 2009, Ms. Wiley came back to Dr. Joshi stating that she was unable to afford the Suboxone prescription she was given in March. (Tr. 66). However, Ms. Wiley asked for another Suboxone prescription stating that she now had money to afford the Suboxone. (Tr. 66). Although Dr. Joshi had no independent verification that Ms. Wiley was addicted to any narcotic, he issued her a prescription and never saw her again. (Tr. 66, 67). Dr. Joshi stated that the human body gets used to taking a number of Vicodin each day. (Tr. 75). As a result, a person could take large doses of Vicodin and function normally. (Tr. 75).

CONCLUSIONS OF LAW

Fifth Amendment

Ms. Wiley asserts that her Fifth Amendment rights were violated when she was questioned by police without first being given her *Miranda* warnings. The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Law enforcement officers violate a person's Fifth Amendment rights when they subject her to a custodial interrogation without advising her of her constitutional rights to remain silent and to have counsel present. *Miranda v. Arizona*, 384 U.S. 436, 471 (1966). An interrogation is considered to be "custodial" where "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. "The test is whether, under the circumstances of the interrogation, a reasonable person would have felt at liberty to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). In determining whether a person is "in custody," the factors to be considered include whether: (1) the encounter occurred in a public place; (2) the suspect consented to speak with the officers; (3) the officers informed the individual he was not under arrest and was free to leave; (4) the individual was moved to another area; (5) there was

a threatening presence of several officers and a display of weapons or physical force; and (7) the officers' tone of voice was such that their requests would likely be obeyed. *United States v. Barker*, 467 F.3d 625, 628-29 (7th Cir. 2006).

Based on the totality of the circumstances, this Court finds that Ms. Wiley was not in custody and, as such, the agents were not required to inform her of her *Miranda* rights. To start, the encounter began in a public place - at a gas station - and ended in a private place - the police station. Although there were four or five law enforcement officers present, none of those officers brandished a weapon, blocked Ms. Wiley from leaving, or threatened her in any way. Ms. Wiley was never handcuffed or physically restrained way during the encounter. Notably, Ms. Wiley was explicitly told that she was not under arrest and was free to leave. *Yarborough*, 541 U.S. at 662 (compelling that factor number three weighs heavily in finding no custodial interrogation. If police tell a reasonable person he is not under arrest, theat person will likely not feel his freedom of movement is restrained to "the degree associated with a formal arrest."). With that in mind, Ms. Wiley still consented to speak with the officers. In fact, she voluntarily came to the Merrillville police station and answered questions in a cafeteria-like room. And, further, after the initial interview with Agents Burke and Bookwalter concluded, Ms. Wiley actually asked to speak further with Agent Burke. These

facts do not in any way suggest that Ms. Wiley was constrained in a manner tantamount to a formal arrest. Based on the facts before the Court, a reasonable person in Ms. Wiley's situation would have felt at liberty to terminate the interrogation and leave.

Ms. Wiley attempts to escape this conclusion by paralleling her situation to the situation described in *United States v. Slaight,* 2010 WL 3431621 (7th Cir. Sept. 2, 2010), where officers attempted to disguise a custodial interrogation as noncustodial. In *Slaight*, the defendant was being investigated for downloading child pornography. Law enforcement officials received a warrant to search and seize the defendant's computer; however, they purposefully did not seek to obtain an arrest warrant because they wanted to question the defendant without giving him *Miranda* warnings. *Id.* at *1. Nine or ten officers arrived at the defendant's home one morning and knocked on the door. When no one answered, officers forced the door open with a battering ram and entered the home with their guns drawn. The officers found the defendant and an unexpected female in the home.

Officers told the defendant that they would prefer to interview him at the police station rather than at his home. He drove to the station with two officers in their car. At the police station, the defendant was placed in a tiny interview room that had been reserved prior to the time law enforcement officers picked up the defendant from his home. The police told Slaight that he was

-11-

free to leave; however, the defendant stated that he had no choice but to remain in the interview room because the police were going to arrest him anyway.  Notably, the police officers did not dispute that point.

Ultimately, the court of appeals found that the officers "made ingenious, pertinacious, but ultimately (as it seems to us) transparent efforts to disguise a custodial interrogation as noncustodial." *Id.* at *1.  Even though the officers attempted to disguise the interrogation as noncustodial by not placing the defendant under arrest, the court nevertheless held that the defendant was in a custodial interrogation because "of force at Slaight's home, the protracted questioning of him in the claustrophobic setting of the police station's Lilliputian[2] interview room, and the more than likelihood that he would be formally placed under arrest if he tried to leave because the government had so much evidence against him." *Id.* at 6.

The instant case is quite distinguishable from *Slaight*.  There is no indication that the officers intended to disguise a custodial interrogation as noncustodial.  Nor is there evidence that the officers did so or attempted to do so.  Unlike the 9 to 10 officers breaking in the door with guns drawn in *Slaight*, there was no force shown by any of the officers - either at the scene where the car

---

[2]Referencing the six inch tall inhabitants on the island of Lilliput in Jonathan Swift's Gulliver's Travels.

was pulled over or at the police station - in this case.  The mere presence of four to five officers at the scene simply does not mandate a different conclusion.  Moreover, the interview conditions in *Slaight* were far different than those experienced by Ms. Wiley.  While the defendant in *Slaight* was subjected to a protracted interview in a tiny room, Ms. Wiley was questioned in a large, cafeteria-like room.   And, finally, unlike the situation in *Slaight*, there is no evidence that Ms. Wiley or a reasonable person in Ms. Wiley's position would believe that she would be formally arrested if she tried to leave.  In fact, Ms. Wiley went home after her interview concluded.

This Court finds that since Ms. Wiley was not in custody, officers were not required to give her *any Miranda* warnings.


Fourth Amendment

Ms. Wiley contends that the consent she gave to search her purse and to speak with officers was not voluntarily given and, therefore, her Fourth Amendment rights were violated.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend IV.  Officers can conduct a warrantless search pursuant to voluntary consent.  "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of

fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The government bears the burden to prove that consent was voluntary by a preponderance of the evidence. *United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004). In determining voluntariness, the following facts are considered: (1) the person's age, intelligence and education; (2) whether she was advised of her constitutional rights; (3) how long she was detained before she gave her consent; (4) whether her consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; (6) whether she was in police custody when she gave her consent; and (7) the intoxication of the individual. *United States v. Johnson*, 495 F.3d 536, 542 (7th Cir.), cert. denied, 552 U.S. 1069 (2007); *United States v. Scheets*, 188 F.3d 829, 839-40 (7th Cir. 1999).

Based on the totality of the circumstances, this Court finds Ms. Wiley's consent was voluntarily given. To start, Ms. Wiley is an adult, not a juvenile. *A.M. v. Butler*, 360 F.3d 799-800 (7th Cir. 2004)(noting that when courts are examining confessions by a mature adult, courts need not exercise the special caution as when the confession is made by a juvenile). It is undisputed that Ms. Wiley was not advised of her constitutional rights. However, this is not surprising because Ms. Wiley was not in custody and, therefore, the officers were not required to explain her

constitutional rights to her. Thus, Ms. Wiley not being advised of her constitutional rights is not significant. See e.g., *Bernitt*, 392 F.3d at 877(finding consent to be voluntary even when in custody defendant not advised of constitutional rights). What is significant is the manner in which Ms. Wiley gave consent. *United States v. Figueroa-Espana*, 511 F.3d 696, 705 (7th Cir. 2007). Ms. Wiley gave her consent to search her purse and also consented to answer questions immediately after being asked. There was no physical coercion used by any officers nor was Ms. Wiley in custody at the time she gave consent. The Government presented ample evidence to show that Ms. Wiley freely and voluntarily consented.

Ms. Wiley's main contention is that she was under the influence of Vicodin during the traffic stop and subsequent interview and, therefore, her consent could not be voluntary. Despite this argument, there is no evidence demonstrating that Ms. Wiley was under the influence of Vicodin when she consented to the search or questioning by officers. At most, there was evidence that Ms. Kozinski saw Ms. Wiley take some unidentified pill while at work on February 24th at Dr. Yaniz's office. Ms. Kozinski was unaware whether that pill was aspirin, Vicodin, or something else. In any event, there were no outward signs that Ms. Wiley was intoxicated.

Even if Ms. Wiley was intoxicated, that intoxication would not automatically render her consent involuntary; rather, it would be

merely another factor to be taken into consideration when assessing the totality of the circumstances. *Scheets*, 188 F.3d 939-40. And, since there is no evidence that Ms. Wiley was intoxicated to the point of affecting her ability to understand questions or give appropriate answers, any intoxication she was under would be considered minor and of minimal consequence. *Id.* (citing *United States v. Gay*, 774 F.2d 368, 374 (10th Cir. 1985)(explaining the effect of different degrees of intoxication)). As a result, any Vicodin use or addiction did not vitiate the voluntariness of her consent.

CONCLUSION

For the reasons set forth above, Defendant's motion to suppress evidence and statements is **DENIED**.

**DATED: November 8, 2010**        /s/RUDY LOZANO, Judge
                                   **United States District Court**